### In the Matter of LEHIGH AND HUDSON RIVER RAILWAY COMPANY, Debtor.

#### No. 72 B 419.

United States District Court,
S. D. New York.
April 24, 1974.

---

James F. Dausch, Dept. of Justice, for the U. S.

James E. Howard, Philadelphia, Pa., for the trustees of the Penn Cent. Transp. Co.

Richard D. Lalanne, New York City, for the trustees of the Lehigh Valley Railroad Co.

Michael D. McDonald, Albany, N. Y., for the State of N. Y.

Kenneth S. Levy, Deputy Atty. Gen., for the State of N. J.

Gordon P. MacDougall, Washington, D. C., for the Commonwealth of Pa.

John G. Troiano, New York City, trustee, Timothy V. Smith, New York City, N. Y., for trustee.

ROBERT J. WARD, District Judge.

The Lehigh and Hudson River Railway ("the railroad") is a Class II railroad* presently in reorganization within the jurisdiction of this Court under Section 77 of the Bankruptcy Act (11 U.S. C. § 205). Section 207(b) of the Regional Rail Reorganization Act of 1973 (Pub.L. 93–236, Jan. 2, 1974, hereinafter referred to as "the Act") requires this Court to determine, before May 2, 1974

> "whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. § 205) and that [sic] the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act."

If this initial question is decided in the negative, the Court is required before July 1, 1974 to order that reorganization be proceeded with under the Act, unless it at that time finds that the Act does not provide a process which would be fair and equitable to the estate of the railroad, in which case it must dismiss the reorganization proceedings. At the present time only the initial question is before this Court.

A hearing was held on April 1, 1974 upon notice to all parties and all creditors of the railroad, to supplement the information already before the Court as a result of its extensive examination of

---

* A Class II railroad is one with annual revenue of less than $5 million.

the financial condition of the railroad in July and October of 1973. In July, the Court considered whether the railroad's desperate lack of cash and the absence of any potential resources, public or private, justified its ceasing to operate; in October, the Court authorized the pledge of four locomotives as security for an emergency loan to enable the railroad to continue operating. The Court viewed both ceasing operations and further encumbering the property of the railroad as extraordinary measures, warranted only by extreme financial necessity unrelieved by already stringent budgeting. The evidence introduced at those two hearings over a total of three days amply demonstrated that the railroad derives insufficient income from its operations to sustain itself, that all avenues for increasing revenue or decreasing expenses had been explored and were presently unavailable, that local industry depends upon the railroad, that the railroad is an important link in a wider network of rail transportation, and that neither the governments of the affected states nor the federal government were prepared to subsidize the operation of the railroad, although all agreed upon the importance of its continued operation. At the time of those hearings it appeared to all that the survival of the railroad depended upon the imminent passage of comprehensive federal legislation which would include provisions for financial assistance. The question now before the Court is whether intervening circumstances have so changed the position of the railroad that it is advisable to refuse the assistance offered by the Act and attempt to reorganize independently.

The Commonwealth of Pennsylvania ("Pennsylvania") alone opposes the railroad's participation in reorganization under the Act. Its first objection is jurisdictional. It contends that the Act's mandate that the Court determine the public interest in ruling on the question now before it is an unconstitutional delegation of a legislative function to a judicial body and that therefore the Court is without jurisdiction to decide this question. Since this argument is being raised in other forums and an appeal is contemplated, the parties have stipulated that it not be argued or decided here, without prejudice to its being raised at a later time. Without deciding the question, the Court simply notes that in its capacity as overseer of the reorganization of this railroad under Section 77 of the Bankruptcy Act it has frequently and necessarily considered the interest of the public, most recently in the July and October hearings discussed above.

Also as a jurisdictional matter, Pennsylvania contends that the Act was not intended to apply to Class II railroads, since they were not specifically itemized in its provisions nor included with discussions of Class I railroads in reorganization in the House committee report.

█ It is clear to this Court that the Act is intended to apply to Class II railroads. The Act makes no distinction between Class I and Class II railroads and, indeed, for its purposes, there is no real distinction to be made. The only difference between the two is the dollar amount of annual revenue, and railroads of both classes are now in equally desperate straits. The Senate committee report itself refers to Class II railroads as part of the crisis situation the Act is designed to correct. S.Rep. No.93–301, 93d Cong. 1st Sess. (1973). The Department of Transportation in the first two sentences of its mandated "30 day report" explicitly mentioned this railroad:

## "LEGISLATIVE MANDATE

Much of the railroad system in the region comprising the Northeast and portions of the Midwest has fallen into serious physical disrepair and financial insolvency.[1] Seven of the region's Class I and one of its Class II railroads are undergoing reorganization under section 77 of the Bankruptcy Act, and some are close to liquidation.[2]" (The footnotes define the region and Class I and Class II railroads and name those railroads which

are in reorganization.) U. S. Dep't of Transportation, Rail Service in the Midwest and Northeast Region, at 1 (Feb. 1, 1974). (Hereinafter referred to as "the Report.")

The Department of Transportation has made a statement, incorporated into the record of this proceeding on April 1, 1974, indicating that it will recommend to the United States Railway Association that the railroad be given due consideration as an alternate route to New England in the final system plan, and that it has as yet made no analysis of whether the railroad's lines are "potentially excess." While this statement is ambiguous concerning the final form in which the railroad may be incorporated into a final system plan, the Department of Transportation clearly understands the Act to apply to this Class II railroad.

In sum, this railroad is a part of the problem, of crisis proportions, affecting rail transportation in the northeast and was specifically mentioned in both the Senate Report on the proposed Act and the Department of Transportation Report made pursuant to the Act. It was not specifically excluded from the provisions of the Act. The Department of Transportation intends to recommend its consideration as part of the final system plan. In the absence of a clear legislative indication to the contrary, this Court considers the railroad within the scope of the Act's provisions.

In addition to its jurisdictional contentions, Pennsylvania argues that the railroad is reorganizable on an income basis, and that the public interest would best be served by its reorganization outside the Act. It makes these arguments in the face of a strong presumption, expressly stated in Section 207(b) of the Act, that railroads in reorganization in the region should come under the Act, and in the face of overwhelming evidence earlier presented concerning the desperate financial situation of the railroad. The arguments it advances are unpersuasive.

It first attempts to define the Section 207(b) term "reasonable time" for reorganization outside the Act. It presents a table indicating the various lengths of time that railroads have been in reorganization proceedings in the past forty years. The range is from three years to as long as twenty-two years, with the great majority between eight and sixteen years. By contrast, of course, the present reorganization proceeding is of relatively short duration. Pennsylvania attempts from this data to conclude that even somewhat remote possibilities of successful income based reorganization can be considered reasonable and justify reorganization outside the Act. In so doing it ignores the fact that this railroad recently has been and soon may be again on the verge of liquidation, that it has insufficient funds to operate, and that the timetable of the Act in response to a situation deemed critical is rather more accelerated than what might in the past have been considered a reasonable time for reorganization. Indeed, the very evidence Pennsylvania puts forth highlights the problem which the Act is designed to remedy. In the judgment of this Court, a "reasonable time" for reorganization outside the Act must be at least approximately as rapid as the time schedule of the Act. None of the present possibilities can realistically be said to fall within this time frame.

The Trustee of the railroad has recently filed a petition as a creditor in the reorganization proceeding of the Penn Central Transportation Company ("Penn Central"), requesting that the latter be directed to route traffic over the Lehigh and Hudson River line, in a traffic pattern followed until the New Haven Railroad's inclusion into Penn Central. The railroad maintains that this would be economical for Penn Central since it would provide a shorter route for certain traffic than that presently followed; it would also provide sufficient additional revenue to the railroad to permit it to operate profitably.

The latter effect would indirectly benefit the Penn Central estate since Penn Central is in turn both a creditor and shareholder of the railroad. No hearing has yet been held on this petition and the outcome is at best uncertain. The Penn Central, itself in reorganization under Section 77 of the Bankruptcy Act, is eligible for inclusion under the provisions of this Act. Even were the present reorganization Court to order a particular traffic flow, that determination would be subject to change, especially in the context of a new final system plan under the Act. Thus, this source of additional revenue for the railroad, while a possibility which merits serious exploration and full consideration, does not in itself provide sufficient ground for an affirmative finding that the railroad is reorganizable on an income basis within a reasonable time.

The second distant glimmer upon which Pennsylvania would have this Court rely is the proposal recently proffered by the Lehigh Valley Railroad Company and Reading Railroad Company, to create a Mid-Atlantic Rail Corporation ("MARC") of which this railroad's line would be a contributing part. MARC's chief proponents acknowledge that its realization will require massive funding and some time, and indeed now look to the Act as the source of funding. Such a speculative possibility cannot serve as the basis for a decision to reorganize outside the Act.

■ Thirdly, Pennsylvania points to legislation recently introduced in New Jersey which, if passed, would provide a subsidy to the railroad. (Pennsylvania itself, with only one mile of the railroad within its borders, is unwilling to provide it meaningful financial assistance.) In the judgment of this Court future state subsidies, even if the enabling legislation is enacted, are not the "income basis" for reorganization referred to in the Act.

The thrust of Pennsylvania's arguments appears to be that the railroad should be kept alive independently because the competition that it would provide is essential to healthy rail service in the region. It points out that the Act provides no guarantee that this route would be continued, yet itself mandates competition among healthy carriers. If such a course were realistically possible the Court would be inclined to agree. This is not, however, a healthy carrier, but one desperately in need of resuscitation. Moreover, the Secretary of Transportation in his initial report considered the Mid-Atlantic to New England route insufficiently traveled to support competitive carriers. (*See*, Report, *supra*, pp. 25–36.)

This Court considers the question whether, in the overall scheme of a final system plan, the Lehigh and Hudson River route should be maintained as part of a competitive line, as part of the Consolidated Rail Corporation, or not at all, to be beyond the scope of the present inquiry. However, it is clear that the interest of those directly affected as owners, creditors, or consumers of its services requires that the railroad be kept alive in some form, and that it cannot survive on its own. It is equally clear that the interim cash assistance offered under the Act is the only actual resource available.

■ For the reasons stated, this Court finds that the railroad cannot be reorganized on an income basis within a reasonable time and that the public interest requires reorganization under the Act. The foregoing constitutes the initial finding of this Court pursuant to Section 207(b) of the Regional Rail Reorganization Act of 1973.

It is so ordered.